IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


SHERRY LYNN ROMINES,      )
                                   )
v.                                  )      No. 3:11-1205
                                   )
CAROLYN W. COLVIN,          )
      Acting Commissioner of      )
      Social Security[1]             )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Supplemental Security Income ("SSI"), as provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 9) should be DENIED.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this case.

# I. INTRODUCTION

On May 20, 2008,[2] the plaintiff protectively filed for SSI, alleging disability due to arthritis in her knees, shoulders, and hands; carpal tunnel syndrome; back pain; muscle disease; asthma; migraines; nerves; and a history of special education. (Tr. 12, 84, 117-22, 130, 135.) Her application was denied initially and upon reconsideration. (Tr. 83-86, 90-97.) The plaintiff appeared and testified at a hearing before Administrative Law Judge Brian Dougherty ("ALJ") on October 27, 2010. (Tr. 25-63.) On November 22, 2010, the ALJ entered an unfavorable decision. (Tr. 12-20.) On October 18, 2011, the Appeals Council denied the plaintiff's request for review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

# II. BACKGROUND

The plaintiff was born on March 21, 1971, and she was 37 years old as of her application date. (Tr. 130.) She attended school through approximately the eighth or ninth grade while taking special education classes and has worked as a laundry worker, housekeeping cleaner, and shirt folder. (Tr. 32, 43, 46-47, 55.)

---

[2] There is some confusion in the record about when the plaintiff filed her application. The application itself is dated October 4, 2005 (tr. 117, 183), which may be the date of a previous application; however, both the parties and the ALJ agree that the plaintiff's current application was filed on May 20, 2008. Docket Entry No. 9-1, at 2; Docket Entry No. 15, at 1; (tr. 12, 183). Additionally, although the plaintiff alleged a disability onset date of June 5, 2005 (tr. 117), because she filed for SSI, which does not provide for retroactive payments, the ALJ correctly analyzed whether she was disabled on or after her application date. (Tr. 14). *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). *See also* Soc. Sec. Rul. 83-20, 1983 WL 31249, at *7-8.

**A. Chronological Background: Procedural Developments and Medical Records**

    **1. Musculoskeletal / General Health**

From 2004 to 2010, the plaintiff presented to several different hospital emergency rooms with complaints of headaches and pain in her neck, back, shoulders, wrists, abdomen, hips, ankles, and toes. (Tr. 197-272, 273-77, 289-360, 361-83, 529-77.) A number of x-rays and CT scans taken during this time were unremarkable, showing essentially no abnormalities.[3] (Tr. 198, 200, 214, 225, 246-47, 254, 294, 306, 308-10, 317, 333, 335, 339, 344-45, 351, 377-80, 534, 549, 577.) From June 2007 through January 2009, she presented on a number of occasions to New Horizon Family Practice ("New Horizon") where she was seen primarily by Dr. Vivak Bhatt for ailments including chest pain, joint pain, muscle weakness, migraine headaches, weakness, numbness, depression, anxiety, suicidal thoughts, asthma, and gastroesophageal reflux disease ("GERD"). (Tr. 431-65.)

From February to April 2008, the plaintiff presented to Nashville Bone and Joint, PLLC, where she was seen by Jeffrey Miller, a physician's assistant, for treatment of her shoulder, knee, and ankle pain. (Tr. 521-28.) In February 2008, Mr. Miller determined that her ankle pain stemmed from plates and screws from a previous surgery, and he recommended surgical intervention to remove them.[4] (Tr. 522.) A March 27, 2008, right knee MRI was unremarkable. (Tr. 525.) Her shoulder and knee were treated with injections, and Mr. Miller recommended that she pursue physical therapy for her shoulder. (Tr. 524.)

---

    [3] An x-ray of the plaintiff's left ankle in 2004 showed metal screws and plates from a previous ankle surgery. (Tr. 344-45.)

    [4] It does not appear that this surgery was ever performed.

The plaintiff was treated by Dr. Basit Aziz from May to September 2010, for a number of ailments including hyperlipidemia, dizzy spells, lumbago, neck pain, back pain, anemia, asthma, osteoporosis, scoliosis, B12 and iron deficiencies, migraine headaches, trouble sleeping, chest pain, nausea, GERD, knee pain, ear pain, sore throat, congestion, and anxiety. (Tr. 477-520.) CT scans of her cervical, thoracic, and lumbar spine taken on May 7, 2010, were normal, and x-rays taken the same day showed mild levoscoliosis of the upper lumbar spine. (Tr. 512-15.) On September 3, 2010, Dr. Aziz noted the plaintiff's reports that her "pain meds [were] doing well to control pain so she can do daily activities," she sometimes had trouble sleeping, her "breathing meds help[ed] a lot," and her anxiety medications "help[ed]," although she was still having 3-4 anxiety attacks per day. (Tr. 482.)

### 2. Asthma

The plaintiff also frequently presented to various emergency rooms and physicians' offices with symptoms of asthma including shortness of breath, congestion, wheezing, and chest pain. On June 14, 2004, she presented to the Hendersonville Medical Center emergency room ("HMC") with an asthma attack which included wheezing, dizziness, coughing, and pain in her chest, back, and abdomen. (Tr. 359.) She was observed to be in no acute distress with an occasional cough, and the attending physician noted that her lungs were clear and her physical exam "essentially unremarkable" and that "[i]t appear[ed] that [she was] wheezing intentionally." *Id.* A chest x-ray showed "[n]o acute cardiopulmonary disease," and she was diagnosed with "[u]pper respiratory symptoms with

questionable bronchospasm." (Tr. 359-60.) She was given a nebulizer treatment of Xopenex and Atrovent as well as Decadron and Rocephin.[5] (Tr. 359.)

On September 14, 2004, the plaintiff presented to HMC with shortness of breath, congestion, ear pain, and chest pain that was "worse with deep inspiration." (Tr. 352.) On exam, her respiratory effort was "easy," and her lungs had "[b]ilateral expiratory wheeze with good air exchange" and "[n]o focal rales or rhonchi." *Id.* She was diagnosed with "[a]cute exacerbation of reactive airway disease" and "[s]erous otitis media." *Id.* She was given Lortab for ear and chest pain and a Xopenex nebulizer treatment with Prednisone, which provided "good relief of her symptomatology."[6] (Tr. 352-53.) She returned to HMC on January 30, 2005, with complaints of coughing, wheezing, chest pain, chills, and a headache lasting five days. (Tr. 340.) She demonstrated inspiratory wheezing on examination, but a chest x-ray was normal. (Tr. 340-41.) She was diagnosed with "[a]cute bronchitis with acute asthma" and given a Xopenex and Atrovent nebulizer treatment as well as Levaquin, Decadron, and Codiclear.[7] (Tr. 340.)

On August 31, 2005, the plaintiff presented to the Tennessee Christian Medical Center emergency room ("Tennessee Christian") with an asthma attack that had begun the previous night. (Tr. 231.) She was given a breathing treatment of Solu-Medrol and reported that she felt "much

---

[5] Xopenex is an inhalation solution used as a sympathomimetic bronchodilator. Saunders Pharmaceutical Word Book 769 (2009) ("Saunders"). Atrovent is an inhalation solution used as an anticholinergic bronchodilator for bronchospasm, emphysema, and chronic obstructive pulmonary disease ("COPD"). *Id.* at 70. Decadron is a corticosteroidal anti-inflammatory. *Id.* at 204. Rocephin is an antibiotic. *Id.* at 621.

[6] Lortab is a narcotic analgesic. Saunders at 415. Prednisone is a corticosteroidal anti-inflammatory and immunosuppressant. *Id.* at 575.

[7] Levaquin is an antibiotic. Saunders at 402. Codiclear is a narcotic antitussive and expectorant. *Id.* at 174.

better" afterwards.[8]  (Tr. 234.)  She was diagnosed with "[a]sthma, unspecified with (acute) exacerbation" and wheezing.  (Tr. 236.)  She returned to Tennessee Christian on January 24, 2006 with shortness of breath and wheezing.  (Tr. 260.)  A chest x-ray showed "[e]vidence of old granulomatous disease" but was otherwise normal.  (Tr. 262-63.)  She was given a breathing treatment, after which she reported that she felt "much better," and she was diagnosed with "bronchitis, not specified as acute or chronic," "[a]sthma, unspecified with (acute) exacerbation," and "unspecified sinusitis (chronic)."  (Tr. 261, 264, 266.)  On February 4, 2006, she presented to Tennessee Christian with a right shoulder injury, and, although she was not treated for asthmatic symptoms, she was diagnosed with "[a]sthma, unspecified."  (Tr. 212-16.)

On June 11, 2006, the plaintiff presented to the Summit Medical Center emergency room ("Summit") with shortness of breath, wheezing, chest pain, sore throat, and right ear pain, and she reported that "she had [an] onset of asthma attacks one week prior to arrival."  (Tr. 373.)  She was given an Albuterol and Atrovent nebulizer treatment after which she reported improved symptoms.[9]  (Tr. 374.)  A chest x-ray showed a "small number of calcified granulomas" but "[n]o acute disease."  (Tr. 374, 383.)  She was diagnosed with "acute asthma exacerbation" and "chest pain consistent with pleurisy," prescribed Lortab and Prednisone, and discharged in stable condition.  (Tr. 374.)

A pulmonary function test on October 12, 2006, showed normal spirometry.  (Tr. 288.)  The plaintiff returned to Summit on October 28, 2006, with shortness of breath, "sharp" chest pain, cough, and congestion.  (Tr. 371.)  Upon examination, she was in no acute distress, her lungs showed

---

[8] Solu-Medrol is a corticosteroidal anti-inflammatory and immunosuppressant.  Saunders at 653.

[9] Albuterol is a sympathomimetic bronchodilator.  Saunders at 22.

"very mild inspiratory stridor" with "no expiratory wheezes," "no rhales or rhonchi," and "no focal egophony or decreased dullness to percussion." *Id.* She was diagnosed with laryngitis and given a treatment of Hydroxyzine, Albuterol, Atrovent, and Solu-Medrol.[10] (Tr. 371-72.) A chest x-ray showed "[m]inor chronic granulomatous changes" but "[n]o evidence of acute cardiopulmonary process." (Tr. 382.)

On February 23, 2007, she presented to Summit with headache, chest congestion, and wheezing. (Tr. 369.) She reported that her asthma was "flaring up" and that Albuterol had been providing "minimal relief." *Id.* On exam, she demonstrated expiratory wheezing (tr. 369), and a chest x-ray showed "scattered calcified granulomas" but "[n]o acute cardiopulmonary abnormalities." (Tr. 381.) She was diagnosed with "[a]sthma exacerbation" and "[e]ustachian tube dysfunction," given an Albuterol and Atrovent nebulizer treatment, which improved her symptoms, and prescribed Allegra D and Pulmicort.[11] (Tr. 369-70.) She returned to Summit on August 11, 2007, with shortness of breath; however, she left without being seen, presumably because the emergency room was very busy. (Tr. 366.)

On August 27, 2007, the plaintiff presented to New Horizon complaining of "frequent asthma exacerbations" that had necessitated emergency room visits. (Tr. 446.) She reported that she had been "taking her breathing treatment more frequently" but that she still had chest pain and tightness, shortness of breath, generalized fatigue, and wheezing. *Id.* She said that Advair had "helped control

---

[10] Hydroxyzine is an anxiolytic, minor tranquilizer, antiemetic, antihistamine, and antipruritic. Saunders at 357.

[11] Allegra D is a nonsedating antihistamine and decongestant. Saunders at 28. Pulmicort is a corticosteroidal anti-inflammatory for chronic asthma. *Id.* at 594.

her asthma in the past" but that she could no longer afford it because her insurance would not pay for it, and she was prescribed Singulair, Proventil, and Albuterol nebulizer treatments.[12] *Id.*

On April 28, 2008, the plaintiff presented to Dr. Bhatt for a follow-up visit on her asthma. (Tr. 442.) She reported that she was taking nebulizer treatments four times a day and using an Albuterol inhaler. *Id.* On examination, her respiratory effort was "normal, not labored, [with] no intercostal retractions," and Dr. Bhatt described her "allergic rhinitis/asthma" as "not well-controlled" and refilled her prescriptions. *Id.* The plaintiff had a follow-up appointment with Dr. Bhatt on May 27, 2008. (Tr. 441.) Her respiration was again described as "normal, not labored, [with] no intercostal retractions," and Dr. Bhatt changed her asthma medication to Symbicort.[13] *Id.*

On June 14, 2008, the plaintiff presented to Summit with chills, dizziness, and chest pain. (Tr. 362.) She had "mild expiratory wheezes . . . bilaterally" on exam, but a chest x-ray showed "[n]o acute or significant abnormality," and she was given a treatment of Albuterol and Atrovent nebulizer with Hydroxyzine and diagnosed with "[r]eactive airway disease exacerbation." (Tr. 362-63, 378.) On June 27, 2008, she presented to Dr. Bhatt for a refill on her medications, and she reported that she had recently been to the emergency room with an asthma attack. (Tr. 439.) Dr. Bhatt diagnosed her with "uncontrolled asthma" and gave her a sample of Advair. *Id.* She returned to Dr. Bhatt on July 25, 2008, for a medication refill and reported that she was having 3-4 asthma attacks a day even while taking medication. (Tr. 438.) Dr. Bhatt observed that there were

---

[12] Advair is a corticosteroidal anti-inflammatory and bronchodilator combination for chronic asthma and COPD with chronic bronchitis. Saunders at 15. Singulair is used for allergic rhinitis and the prophylaxis and chronic treatment of asthma. *Id.* at 644. Proventil is a sympathomimetic bronchodilator. *Id.* at 591.

[13] Symbicort is a corticosteroidal anti-inflammatory and bronchodilator combination for chronic asthma. Saunders at 677.

"n[o] signs of exacerbation" and that the plaintiff had requested a "note to say that she can't work b/c of her asthma and bone disease and knees." *Id.* However, he indicated that he told the plaintiff that "osteopenia [was] not the cause of her pain" and that the cause of her pain "could be some bulging discs." *Id.* He added that "she would have work restrictions (environment, type of work) but that she does not have problems that prevent her from working in some way. She states she can't read or write and doesn't have time or patience to take classes now." *Id.*

On August 25, 2008, the plaintiff presented to Dr. Bhatt for a refill on her medications, and she reported that she "ha[d] not been taking Spiriva and . . . [was] having some exacerbation of her [a]sthma." (Tr. 437.) Dr. Bhatt explained to the plaintiff that she could not rely on samples and would need to get her prescriptions filled. *Id.* She followed up with Dr. Bhatt again on September 26, 2008, and reported that she was experiencing asthma attacks 2-3 times a day and that the attacks were triggered by pollen. (Tr. 436.) On exam, she had "decreased breath sounds throughout with occasional inspiratory wheezing." *Id.* On December 28, 2008, the plaintiff presented to Summit with a cough, congestion, poor breathing, chest pain, and a headache. (Tr. 529.) She said that she had "used her nebulizer machine many times today with no relief" and rated her chest pain as a six out of ten on the pain scale. *Id.* On exam, she was positive for rhonchi and bilateral wheezing, and she was given a breathing treatment of Albuterol and Atrovent as well as Lortab and Rocephin for chest pain. (Tr. 530.) A chest x-ray showed "[n]o active cardiopulmonary disease," but an electrocardiogram was abnormal. (Tr. 456, 530-31.) She was diagnosed with "[a]cute bronchitis," "[n]asal congestion," and "[e]xacerbation of asthma." (Tr. 530.)

On January 20, 2009, the plaintiff presented to New Horizon complaining of chest pain. (Tr. 432.) She reported that her Albuterol inhaler "help[ed] acutely" but that her chest pain would

return after using the inhaler and that, since her last office visit, she was experiencing "less chest tightness after being on Prednisone dose pack." *Id.* She was prescribed Advair, Albuterol, DuoNeb, and Singulair.[14] *Id.* On December 6, 2009, she presented to HMC with shortness of breath, reporting that it had started one week earlier and was worsening and that the level of pain in her chest was a ten out of ten on the pain scale. (Tr. 559, 564.) On exam, she was in "[m]ild respiratory distress" with "[m]ild bilateral wheezes" but "[n]o accessory muscle use, retractions, decreased air movement, stridor or rales." (Tr. 560.) A chest x-ray was normal (tr. 569), and she was diagnosed with "[a]typical chest pain" and "[a]cute asthma exacerbation" and treated with morphine, Levaquin, Bactrim, Solu-Medrol, Albuterol, and Atrovent.[15] (Tr. 562.)

The plaintiff presented to Dr. Aziz with acute asthma attacks on June 21, July 6, and August 4, 2010. (Tr. 485-86, 489-92.) She reported that her pain medications were helping her "daily function and quality of life" but that she was "having trouble sleeping" and that her nebulizer machine was "very old" and "not working." *Id.* On September 3, 2010, Dr. Aziz noted the plaintiff's report that her "breathing meds help[ed] a lot." (Tr. 482.)

### 3. Function Report

On June 24, 2008, the plaintiff submitted a Function Report in which she detailed the activities she was able to perform.[16] (Tr. 148-55.) The plaintiff indicated that she had no difficulties with personal care and that her daily activities were as follows: "get up – try to cook something –

---

[14] DuoNeb is an anticholinergic bronchodilator for COPD. Saunders at 247.

[15] Bactrim is an anti-infective and antibacterial. Saunders at 78.

[16] The form was completed by another individual at the plaintiff's direction. (Tr. 155.)

watch my kids and grandchild – attempt to do chores – cook supper sometimes I try to do evening dishes – otherwise sit & relax – get ready for bed[.]" (Tr. 148.) She reported that she "take[s] care" of her children and grandchild by cooking, "help[ing] them get dressed" and that she does "as much as [she] can." (Tr. 149.) She said that she had "two small kittens" and, when asked if anyone helped her care for other people or animals, the plaintiff indicated that her "daughter does all of it – I cannot." *Id.* She said that she prepares meals twice a day, and "need[s] help with larger pots," but can "cook normal foods like anyone else – it just takes a while . . .[and] someone has to read the directions to [her]." (Tr. 150.) She also indicated that she is "able to attempt to do chores but I need help and it takes a long time." *Id.* She added that she "can't do any chores that require chemicals, because the smell causes asthma attack[s]" and that she "need[s] help with lifting, pushing, pulling, [and] reading directions." *Id.*

### 4. Opinion Evidence

On August 22, 2006, Robert Doran, M.A., a Tennessee Disability Determination Services ("DDS") psychological examiner,[17] completed a clinical interview, mental status evaluation, and assessment of the plaintiff's intellectual functioning and achievement. (Tr. 278-83.) The plaintiff reported that she cannot read or write and needed assistance completing the paperwork associated with the evaluation. (Tr. 278.) The plaintiff reported that she completed the eighth grade in school, and Mr. Doran noted that school records from the Sumner County school system for the 1985-1986

---

[17] It is not entirely clear who completed the psychological evaluation, which is signed by Mr. Doran and Dr. Mark Phillips, Ph.D. but frequently refers to Dr. Patricia Jasnowitz, Ed.D., as the interviewer. (Tr. 278-83.) The ALJ referred to the evaluation as being completed by Mr. Doran, and for the sake of consistency, the Court will do the same.

school year[18] indicated that she received "full-day service in special education." (Tr. 279.) Additionally, Mr. Doran noted that "it appears that she had a 73 IQ score on 5/7/85, on the 'Wechsler' Scale." *Id.*

The plaintiff reported that her current symptoms included irritability, nervousness, nightmares, weight loss, decreased energy, crying spells, and difficulty concentrating. (Tr. 279-80.) She said that she had five children and two pets and that she had never been married but had been in a "romantic relationship" for the past four years. (Tr. 280.) She related that she had worked in housekeeping for "maybe 90 days" but had not had any other jobs. *Id.* She reported that her daily activities included bathing, making her bed, cooking, shopping for groceries, washing laundry, getting her kids to school, and watching television. *Id.* She said that her children "help[ed] her with chores," including washing and putting away dishes, dusting furniture, vacuuming, sweeping, taking out garbage, and washing laundry. *Id.* She said that she had a driver's license and drove "every day" and that she attended worship services "sometimes," visited with relatives "every day," and used to visit "with her best friend 'every day until she moved.'" *Id.* The plaintiff related that "on [her] worst days," she could not get out of bed and her daughter helped her get around, get out of the bathtub, and get dressed. *Id.* Mr. Doran did not formally measure the plaintiff's adaptive functioning but opined that her adaptive skills were in the "low average to average range." (Tr. 281.)

During a mental status evaluation, the plaintiff was asked to state the year and responded that it was "2007" instead of 2006. (Tr. 280.) Mr. Doran noted that, when the plaintiff signed a "form at the end of the evaluation, she wrote her name in cursive penmanship; and she wrote the month,

_____

[18] As will be discussed in more detail below, although the plaintiff's school records were apparently available to Mr. Doran, they were not included in the record before the ALJ or this Court.

day, and year, correctly." *Id.* She refused to perform Serial Sevens or Serial Threes, and, when asked to perform Serial Fives, she responded "100, 101." (Tr. 281.) When she was asked to spell "world," she first responded that she had "no clue," and, when pressed to make an attempt, she said "w-t-a-r-d-s-t-p-e-n." *Id.* When asked to spell "world" backwards, she said "p-u-r-w-s-t-n-a." *Id.* She incorrectly spelled several other words and incorrectly performed addition and subtraction problems. *Id.* She had a raw score of zero on the Similarities Subtest and made substantial errors on several other subtests. *Id.* She was shown a series of fifteen letters, numbers, and symbols for ten seconds and asked to reproduce them, but she was only able to draw "a letter, two symbols, and two unrelated, sequential numbers." (Tr. 281-82.)

She was given the Wechsler Adult Intelligence Scale – Third Edition ("WAIS-III") and obtained a verbal IQ score of 55, a performance IQ score of 54, and a full scale IQ score of 50. (Tr. 279, 282.) She was also administered the Wide Range Achievement Test, Fourth Edition, ("WRAT-IV") and obtained scores of 55 in all areas, including word reading, sentence comprehension, spelling, math computation, and reading comprehension. *Id.* According to Mr. Doran, these scores corresponded to grade equivalents ranging from first grade to below kindergarten and placed the plaintiff's intellectual functioning in the "extremely low range." (Tr. 281-82.)

However, Mr. Doran did not consider the test results to be valid. (Tr. 282.) He observed that the plaintiff "did not put forth her best effort" (tr. 279) and that she contradicted herself during the evaluation and made apparently deliberate errors. (Tr. 281-82.) Mr. Doran opined that "[i]t may be that she has problems with reading, and spelling; however, because of her performance, during the evaluation, no diagnosis is made." (Tr. 282.) He also noted that she "did not exhibit signs of anxiety

or of depression" and assigned her a GAF score of 65-75.[19]  (Tr. 282-83.)  He opined that she was moderately limited in the areas of understanding, remembering, and adapting to changes/requirements and mildly limited in the areas of sustained concentration and persistence and interaction with others.  (Tr. 283.)

The plaintiff also underwent a consultative physical examination on August 22, 2006, with DDS physician Dr. Bruce Davis.  (Tr. 284-86.)  Dr. Davis observed that the plaintiff had full range of motion and good strength in her neck and upper extremities, good finger motion and dexterity, good grip, and normal range of motion in her back.  (Tr. 285.)  She had bilateral thigh tenderness and bilateral knee crepitation but normal knee flexion and straight leg raises.  *Id.*  She had good range of motion in her left ankle and a normal gait, and she was able to perform the heel walk, toe walk, and tandem walk without assistance.  *Id.*  She was alert, oriented, interactive, and able to follow directions, and he found no focal cranial nerve, sensory, motor, or reflex abnormalities.  *Id.*

Dr. Davis diagnosed her with "[p]ersistent bronchial asthma;" "[m]uscoloskeletal disease: osteoporosis, neck, shoulder, wrist, back, ankle, [and] knee complaints;" "untreated anxiety/depression;" and "incomplete education with low literacy skills."  (Tr. 286.)  He opined that she could lift/carry 10-20 pounds occasionally and ten pounds frequently; stand and/or walk 4-6 hours in an eight-hour workday; sit eight hours in an eight-hour workday; and that she had "[o]ther

---

[19] The GAF scale is used to assess the social, occupational, and psychological functioning of adults.  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM–IV–TR").  A GAF score within the range of 61-70 means that the plaintiff has "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) [or] some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*  A GAF score within the range of 71-80 means that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors; no more than slight impairment in social, occupational, or school functioning."  *Id.*

physical/environmental limitations," including "heat/humidity, irritating inhalants, climbing/heights, [and] repetitive/forceful grip." *Id.*

On October 29, 2008, Dr. Ashok Mehta performed a consultative examination of the plaintiff focused primarily on her reported problems of back pain and asthma. (Tr. 384-86.) During the examination, the plaintiff demonstrated no neurological deficits, had full range of motion in her spine and extremities, and was able to perform the squat-and-rise maneuver and heel-to-toe walk. (Tr. 384-85, 389-90.) She was in no respiratory distress, and her lungs had normal air flow but some wheezing. (Tr. 385.) Dr. Mehta completed a Medical Assessment of Ability to do Work-Related Activities (Physical) form in which he opined that the plaintiff could lift and/or carry less than ten pounds occasionally and ten pounds frequently, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. (Tr. 387-88.)

On November 24, 2008, Kathryn Sherrod, Ph.D., a DDS psychological examiner, completed a clinical interview and mental status examination. (Tr. 402-07.) Dr. Sherrod noted that the plaintiff "was vague and guarded when responding to questions regarding her employment history and her daily activities." (Tr. 402.) In Dr. Sherrod's opinion, the plaintiff "appeared to be attempting to present herself as less functional than she actually is throughout the evaluation." *Id.* Dr. Sherrod noted numerous instances in which the plaintiff "made intentional errors on testing tasks," "did not exert adequate effort," and "claim[ed] too many unreasonable symptoms . . . indicating that she was exaggerating the severity of her symptoms." (Tr. 405.) As a result, Dr. Sherrod found the plaintiff's test results to be invalid, and she estimated that the plaintiff functioned in the "low average range of intelligence." (Tr. 405-06.) Dr. Sherrod also administered tests to assess for malingering, and the plaintiff's answers "provide[d] supportive evidence that [she] was malingering." (Tr. 406.)

Dr. Sherrod diagnosed the plaintiff with malingering and found that she was "deceptive and manipulative, exhibiting traits of antisocial personality disorder." (Tr. 407.) She assigned her a GAF score of 60 and opined that the plaintiff had no limitations in the areas of understanding and remembering, concentrating, social functioning, or adaptive functioning.[20] *Id.*

On December 1, 2008, Dr. Mason Currey, Ph.D., a nonexamining DDS psychological consultant, completed a Psychiatric Review Technique ("PRT"). (Tr. 408-21.) Dr. Currey found that the plaintiff had a reported history of learning problems and special education as well as a personality disorder that included malingering and antisocial personality traits. (Tr. 409, 415.) He opined that the plaintiff had mild functional limitations in the areas of activities of daily living and maintaining social functioning, concentration, persistence, and pace. (Tr. 418.) On March 18, 2009, Dr. Rebecca Joslin, Ed.D., Ph.D., a nonexamining DDS psychological consultant, "affirmed" Dr. Currey's assessment. (Tr. 466-67.)

On December 5, 2008, Dr. Patricia Schiff, a nonexamining DDS consultative physician, completed a physical Residual Functional Capacity ("RFC") assessment (tr. 422-29), in which she opined that the plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push and/or pull without limitation. (Tr. 423.) Dr. Schiff opined that the plaintiff had no postural, manipulative, visual, communicative, or environmental limitations except for the need to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to asthma. (Tr. 424-26.) On April 13, 2009, Dr. Christopher Fletcher, a nonexamining DDS

---

[20] A GAF score between 51-60 falls within the range of "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." DSM-IV-TR at 34.

consultative physician, completed a physical RFC assessment, in which he found that the plaintiff had limitations identical to those identified by Dr. Schiff.[21]  (Tr. 468-76.)

## B. Hearing Testimony

At the hearing on October 27, 2010, the plaintiff was represented by counsel, and the plaintiff and a vocational expert ("VE"), Melissa Neel, testified.  (Tr. 25-63.)  Before the plaintiff's testimony, the ALJ asked the plaintiff's attorney whether he "need[ed] any time to submit additional records," to which the attorney responded, "No, Your Honor.  The record is complete."  (Tr. 27.)  Later, the plaintiff's attorney noted that the plaintiff's school records "are not available to us, but at one point in time were available to Social Security, but for whatever reason are not in this file."  (Tr. 30.)

The plaintiff testified that she attended special education classes in school but could not remember whether she completed school through the eighth or ninth grade.  (Tr. 32, 43.)  She testified that she cannot read or write and is "not too good" at math or managing money.  (Tr. 32-34, 43.)  She explained that she has been diagnosed with dyslexia and sometimes sees pictures, words, and numbers backwards.  (Tr. 43-44.)  She said that she has a driver's license, which she obtained by passing a test in which she identified road signs by pictures.  (Tr. 33, 44-45.)  She explained that she only drives in places in which she is familiar.  (Tr. 54.)  She testified that, at previous jobs, she was usually fired because she "was too slow or . . . didn't understand the job right."  (Tr. 36, 43.)  She explained that she worked as a laundry worker but was fired because she could not tolerate

---

[21] Dr. Fletcher's RFC does not include a finding regarding the plaintiff's ability to occasionally lift and/or carry.  (Tr. 469.)

working around chemicals due to asthma and because she was "too slow."[22]  (Tr. 43, 46-47, 52-53.)
She said that she was fired from a job at a retail store because she was not "fast enough."  (Tr. 46.)

The plaintiff testified that she has asthma, bone disease, migraine headaches, muscle spasms, and screws in her ankle that cause difficulty walking.  (Tr. 36.)  She related that she sometimes has asthma attacks 3-4 times a day and that the attacks cause shortness of breath and chest tightness.  (Tr. 36-37.)  She explained that she takes breathing treatments four times a day and that her breathing is irritated by heat, cigarette smoke, chocolate, cheese, and milk.  (Tr. 37, 45-46, 51.)  She said that, when her asthma is "real bad," she has to go to the emergency room 2-3 times a month.  (Tr. 47-48.)

The plaintiff testified that her back and neck hurt "constantly" due to "slipped disks and bulging disks" and that her shoulder "pops out of place."  (Tr. 38, 41.)  She indicated that she also has muscle spasms "all over [her] body," which cause a "twist in [her] back," and that these spasms occur 1-3 times a day, causing pain and requiring her to lie down.  (Tr. 49.)  She related that she is unable to bend from the waist because her neck, back, and hips "lock up" and that her right knee "pops and grinds and swells," causing pain when she tries to stand or walk.  (Tr. 41, 48-49.)  She said that she cannot kneel down on one knee, squat, or stoop.  (Tr. 49.)  She also said that she has problems picking things up and holding them with both hands but particularly with her right hand.  *Id.*

She testified that she has five children, three of whom live with her, and three grandchildren.  (Tr. 34.)  She explained that the children living at the house were ten, thirteen, and eighteen years old and that they were able to get themselves ready for school.  (Tr. 38-39.)  She said that her

---

[22] Although the plaintiff testified at one point that she has never held a full-time job, she later testified that the laundry worker job was full time.  (Tr. 36, 52-53.)

daughter helps her clean the house.  (Tr. 39.)  The plaintiff explained that she is able to wash dishes and laundry but that it "takes [her] a while," adding that it takes her "all day just to do dishes." (Tr. 38-39.)  She testified that she cannot lift a gallon of milk with one hand because of pain in her wrist and thumb[23] but that she can lift a gallon of milk with both hands.  (Tr. 39-40.)  She said that she cannot sit for a long period of time and usually needs to lie down 2-3 times a day, that she can usually stand for only 2-3 minutes at a time, and that she can walk approximately half a block before becoming tired.[24]  (Tr. 40-41, 48.)

The plaintiff testified that she gets depressed "real easy" and that she "get[s] upset" and "frustrated" when she is unable to understand or complete tasks.  (Tr. 42.)  She explained that she has problems staying focused and carrying out activities.  (Tr. 48.)  She related that she takes Xanax, which she said "usually calms [her] down," as well as Lortab, Soma, and Motrin for pain.  (Tr. 42, 45.)  She testified that she gets help from family members or friends to pay her bills and that she relies on cashiers to make sure that she gets the right amount of change.  (Tr. 34-35.)  She said that she sometimes watches television but does so infrequently because it hurts her to sit still, she is not very interested in television, and she has difficulty following along and understanding what is going on.  (Tr. 48.)  She testified that she cannot type and cannot use a computer.  (Tr. 46.)

---

[23] The plaintiff was unsure which hand she was unable to use, explaining that she "get[s] confused" as to which is her left or right hand.  (Tr. 40.)

[24] The plaintiff initially testified that she could walk "maybe a mile, maybe a half a mile" before needing to stop.  (Tr. 48.)  When asked by her attorney whether she knew how far those distances were and whether she meant that she could walk "half a block," the plaintiff affirmed that she meant half a block, explaining that she "get[s] confused" and has "problems remembering things."  (Tr. 48.)

The VE classified the plaintiff's past job as a laundry worker as medium and unskilled and her past jobs as a housekeeping cleaner and folder as light and unskilled. (Tr. 55.) The ALJ asked whether a hypothetical person with the plaintiff's age, education, and work experience would be able to work if she were illiterate, able to perform "very basic math," could lift twenty pounds occasionally and ten pounds frequently, could stand and walk for four hours a day, could sit for six hours a day, could not be exposed to extreme temperatures, fumes, dust, or other irritable inhalants, could not climb, and could not perform "repetitive forceful grip." (Tr. 57.) The VE testified that such a person could not perform the plaintiff's past relevant work but could work in representative jobs as an inspector, assembler, and packer. (Tr. 57-58.) The ALJ then asked whether such a person could still work if she were also limited to performing simple tasks with only occasional interaction with the public and infrequent and gradual change. (Tr. 58-59.) The VE replied that these jobs would still be available to such a person. (Tr. 59.)

Next, the ALJ asked whether a hypothetical person would be able to work if she could lift less than ten pounds occasionally and frequently, stand and walk for two hours a day but walk no more than half a block, and sit six hours a day. (Tr. 59.) Further, the person could occasionally perform postural activities, could not perform "repetitive force grip," could not be exposed to extreme temperatures, and could only be exposed occasionally to gases, fumes, dust, inhalants. (Tr. 59.) The VE testified that such a person could work in sedentary, unskilled jobs as an inspector or cuff folder. (Tr. 59-60.) The ALJ then asked whether these jobs would still be available if the person could perform only simple tasks, needed only occasional interaction with the public, and could adapt to change that was infrequent and gradual. (Tr. 60.) The VE replied that these jobs would still be available to such a person. *Id.*

Finally, the ALJ asked whether the hypothetical person would still be able to work if her physical abilities were reduced further and she was only able to sit for four hours a day and needed to lie down or have unpredictable breaks of 10-15 minutes at least four times a day. *Id.* The VE testified that no jobs would be available to a person with these limitations. *Id.*

In response to questions from the plaintiff's attorney, the VE testified that a change from "no repetitive forceful gripping" to "no repetitive gripping" in the above hypothetical questions would eliminate all available jobs and that a person who needed to use a nebulizer machine four times a day for 10-15 minutes at a time would also not be able perform most unskilled jobs. (Tr. 61.)

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on November 22, 2010. (Tr. 12-20.) Based upon the record, the ALJ made the following findings:

1.   The claimant has not engaged in substantial gainful activity since May 20, 2008, the application date (20 CFR 416.971 *et seq.*).

2.   The claimant has the following severe impairments: asthma; osteoporosis; degenerative disc disease; illiteracy (20 CFR 416.920(c)).

                                        ***

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

                                        ***

4.   After careful consideration of the entire record, the undersigned finds that the claimant can: lift and carry 10 pounds; stand or walk 2 hours and sit 6 hours in an 8 hour workday; cannot be exposed to temperature extremes or pulmonary irritants; can occasionally perform postural activities; can perform simple tasks, can occasionally interact with the general public, and can adapt to infrequent and gradual change.

***

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on March 21,1971 and was 37 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

***

10.     The claimant has not been under a disability, as defined in the Social Security Act, since May 20, 2008, the date the application was filed (20 CFR 416.920(g)).

(Tr. 14-19.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's

22

decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she

seeks disability benefits. *Id.* (citing 20 C.F.R. § 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. § 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376, 157 L. Ed.2d 333 (2003) (citing 20 C.F.R. § 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 416.921(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. 20 C.F.R. § 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment and that the impairment has

lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [her] impairments and the fact that [she] is precluded from performing [her] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden of production shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent

of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

## B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her application date. (Tr. 14.) At step two, the ALJ determined that the plaintiff had the following impairments: asthma, osteoporosis, degenerative disc disease, and illiteracy. *Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* At step four, the ALJ determined that the plaintiff had no past relevant work. (Tr. 18.) At step five, the ALJ determined that the plaintiff was capable of performing work as an inspector or cuff folder. (Tr. 19.)

**C. The Plaintiff's Assertions of Error**

The plaintiff raises four main arguments: (1) that the SSA withheld evidence and the ALJ failed to develop the record regarding her school records, which included an IQ score of 73; (2) that the ALJ failed to properly evaluate the plaintiff's credibility; (3) that the plaintiff meets or equals Listings 12.05(B), 12.05(C), and 3.03(B); and (4) that the ALJ erred in determining the plaintiff's RFC. Docket Entry No. 9-1, at 1-2, 14-22.

### 1. The SSA and state agency did not withhold evidence, and the ALJ properly developed the record.

The plaintiff argues that the SSA and state agency withheld her school records and that the ALJ failed to develop the factual record by not obtaining this evidence. Docket Entry No. 9-1, at 14-15. Specifically, the plaintiff points to Mr. Doran's evaluation, which references the plaintiff's enrollment in "full-day service in special education" and an IQ score of 73 on the Wechsler Scale (tr. 279), and she argues that the ALJ was made aware of these records and should have obtained them for inclusion in the record. Docket Entry No. 9-1, at 14-15.

It is well established in the Sixth Circuit that the plaintiff, and not the ALJ, has the burden to produce evidence in support of a disability claim. *Wilson v. Comm'r of Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. May 29, 2008) (citing 20 C.F.R. § 404.15129(a)). *See also Struthers v. Comm'r of Soc. Sec.*, 101 F.3d 104 (table), 1999 WL 357818, at *2 (6th Cir. May 26, 1999) ("[I]t is the duty of the claimant, rather than the administrative law judge, to develop the record to the extent of providing evidence of [an] impairment."); *Landsaw v. Sec. of Health and Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete

and detailed enough to enable the Secretary to make a disability determination, rests with the claimant.").

Consequently, it remained the plaintiff's burden, not the ALJ's, to produce evidence in support of her disability claim. This is particularly true in this case in which the plaintiff, who was represented by counsel, was aware of the existence of the school records as well as the fact that they were not in the record before the ALJ. (Tr. 30, 185.) Moreover, while the ALJ was informed that the school records were not in the record, *see id.*, the plaintiff's attorney also averred at the hearing that the record was complete. (Tr. 27.) In light of these circumstances, any fault for the absence of the school records lies with the plaintiff and not the ALJ. Although the plaintiff alleges that the SSA and state agency "withheld" the school records, she provides no supporting facts for this allegation other than the fact that the school records are not in the record. The mere absence of the school records does not mean that the SSA or state agency actively excluded or withheld them.

Additionally, the Court notes that the evidence that the plaintiff contends is missing from the record – that she received full-day special education in school and that she had an IQ score of 73 in 1985 – is already established in the record via Mr. Doran's report. (Tr. 279.) As the plaintiff points out, the ALJ was specifically made aware of this information (tr. 30, 186), and he discussed Mr. Doran's report in some detail in his decision. (Tr. 18.) Although the plaintiff contends that the missing school records "may have contained more than one IQ score" and "may have changed the entire outcome of the case" (Docket Entry No. 16-1, at 2), she has still not provided or attempted to provide the records for this Court's review or otherwise shown that there is any relevant information missing.

## 2. The ALJ properly evaluated the plaintiff's credibility.

The plaintiff argues that the ALJ improperly assessed her credibility. Docket Entry No. 9-1, at 15-18. Specifically, she argues that the ALJ "misstated and misconstrued" statements that she made in her Function Report and that he "based his entire credibility findings upon information contained" in that report. *Id.* at 15.

An ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 958 (N.D. Ohio 2003) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994)).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at *5. Consistency between the plaintiff's subjective complaints and the record evidence "tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach v. Comm'r of Soc. Sec.,* 2011 WL 63602, at *11 (6th Cir. Jan. 7, 2011). The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the SSA and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 416.929; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit, in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[25] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853). The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

The ALJ satisfied the first prong of the *Duncan* test when he concluded that the plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms. (Tr. 15.) Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 416.929(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms,

---

[25] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

persistence, or intensity of her pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 416.929(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 416.929(c)(3).[26]

When summarizing the Function Report, the ALJ noted that the plaintiff reported that "she watches her children and grandchild; she does some chores and cooks supper." (Tr. 15.) The plaintiff argues that the ALJ "misstated and misconstrued" her statements, presenting her daily activities as more extensive than she reported. Docket Entry No. 9-1, at 15. In the report, the plaintiff indicated that her daily activities were as follows: "get up – try to cook something – watch my kids and grandchild – attempt to do chores – cook supper sometimes I try to do evening dishes – otherwise sit and relax – get ready for bed." (Tr. 148.) At one point, she explained that she "take[s] care" of her children and grandchild by cooking and "help[ing] them get dressed" and that she does "as much as [she] can." (Tr. 149.) She also explained that she is able to prepare meals twice a day, and that, while she "need[s] help with larger pots" and needs someone to read directions to her, she can "cook normal foods like anyone else – it just takes a while." (Tr. 150.) She indicated that she is "able to attempt to do chores but . . . need[s] help and it takes a long time" and that she "can't do any chores that require chemicals, because the smell causes asthma attack." *Id.*

---

[26] The seven factors include: (I) the plaintiff's daily activities; (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms; (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms; (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on her back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) other factors concerning the plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3).

The Court concludes that the ALJ provided a fair summary of the plaintiff's Function Report. The Court acknowledges that the plaintiff added certain qualifiers to her statements, such as that she "attempts" or "tries" to do certain activities, and that these qualifications were perhaps not fully captured by the ALJ's summary. However, as the ALJ found, the plaintiff did report that she "watches her children and grandchild," "does some chores," and "cooks supper." She clearly made these statements even if she also reported that she has some difficulty performing these tasks. In fact, if the plaintiff's position is that she said that she cannot do these things, that interpretation of the Function Report is not supported by the record.

Moreover, the ALJ did not rely solely on the Function Report when discussing the plaintiff's daily activities but also addressed her reports to Dr. Sherrod:

> The claimant initially claimed her daughter, who had two children ages two weeks and sixteen months old, cooked all the meals; however, when questioned further the claimant indicated she helped cook meals. She indicated that in addition to taking care of her five minor children, two of whom are mentally retarded, she also helped care for her two small grandchildren and did cross-stitch during the day. The claimant reported she was independent in self-care and other daily activities, but required assistance with some household chores. She stated her daughter helped her cook because she was unable to read directions. The claimant maintained that three or four days per week she felt terrible, she drove occasionally, only had friends visit twice a year, and went to church once a year.

(Tr. 17.)

The plaintiff's reports to Dr. Sherrod are similar to those in the Function Report. Furthermore, the ALJ's discussion of Dr. Sherrod's assessment also shows that he did not, as the plaintiff contends, "base his entire credibility findings upon information contained" in the Function Report. Docket Entry No. 9-1, at 15. The ALJ addressed in great detail the plaintiff's exaggeration of symptoms, intentional errors, and malingering during the evaluation with Dr. Sherrod as well as

similar behavior during Mr. Doran's evaluation. (Tr. 17-18.) The ALJ also noted the plaintiff's frequent trips to emergency rooms with pain in her abdomen, back, right shoulder, right wrist, left knee, and left ankle all of which resulted in x-rays and CT scans showing no abnormalities. (Tr. 15.)

The plaintiff's argument that the ALJ based his credibility findings solely on her Function Report relies on the fact that the report was the only piece of evidence that the ALJ discussed before reaching his conclusion that the plaintiff was not fully credible. Docket Entry No. 9-1, at 16; (tr. 15). However, it is not error for the ALJ to state his conclusion before providing the rationale for that conclusion. The plaintiff's argument ignores whole pages of the ALJ's analysis as if the fact that the analysis comes after the conclusion somehow negates its existence. A significant portion of the ALJ's credibility analysis comes during his review of Dr. Sherrod's and Mr. Doran's assessments, which were particularly damaging to the plaintiff's credibility. (Tr. 16-18, 278-83, 402-07.) Mr. Doran was unable to make a diagnosis and found that the results of intellectual and achievement functioning were invalid due to the plaintiff's performance during the evaluation (tr. 282-83), and Dr. Sherrod diagnosed her with malingering after finding that she "attempt[ed] to present herself as less functional than she actually is throughout the evaluation." (Tr. 407.) The ALJ appropriately considered these reports as part of his overall assessment of the plaintiff's credibility. *See* Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *5-6 (providing that an ALJ must consider inconsistencies between a plaintiff's reported symptoms and reports from examining physicians and psychologists).

Contrary to the plaintiff's assertion, the ALJ set forth a detailed analysis evaluating several of the factors in 20 C.F.R. § 416.929(c)(3) and concluding that the plaintiff's subjective complaints of pain were not disabling. (Tr. 15-18.) The ALJ addressed, *inter alia*, the plaintiff's daily activities; the location, duration, frequency, and intensity of her symptoms; and the medical treatment she

received. *Id.* The ALJ discussed in great detail the plaintiff's examinations with Dr. Sherrod and Mr. Doran and the extent to which their opinions of the plaintiff's malingering were damaging to her credibility. *Id.* The ALJ's assessment complies with *Duncan*, Social Security Ruling 96-7p, and 20 C.F.R. § 416.929.

### 3. The plaintiff's impairments do not meet or equal any listed impairment.

The plaintiff argues that she meets the criteria for a finding of disability under Listings 12.05(B), 12.05(C) and 3.03(B). Docket Entry No. 9-1, at 18-20. The ALJ did not address these listed impairments specifically but found that the plaintiff's impairments did not meet or equal any listing. (Tr. 14.)

The plaintiff has the burden of proof at step three to demonstrate that she "has or equals an impairment" listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Little v. Astrue*, 2008 WL 3849937, at *4 (E.D. Ky. Aug. 15, 2008) (quoting *Arnold v. Comm'r of Soc. Sec.*, 2000 WL 1909386, at *2 (6th Cir. Dec. 27, 2000)). The plaintiff's impairment must meet all of the listing's specified medical criteria and "[a]n impairment that meets only some of the criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-532 (1990). If the plaintiff demonstrates that her impairment meets or equals a listed impairment, the ALJ must find the plaintiff disabled. *Little*, 2008 WL 3849937, at *4 (quoting *Buress v. Sec'y of Health and Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)).

**a. Listing 12.05**

The plaintiff argues that her mental impairments meet the requirements of Listing 12.05(B)

and (C).  Docket Entry No. 9-1, at 18.  Listing 12.05 provides that:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . . .
>
> B.  A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(B), (C).  In order to meet Listing 12.05, the plaintiff's

mental impairment must satisfy the criteria in the introductory paragraph, known as the diagnostic

description, as well as the specific severity requirements set forth in sections (B) or (C).  *See Russell*

*v. Astrue*, 2008 WL 5130103, at *2 (E.D. Tenn. Dec. 4, 2008) (citing *Foster v. Halter*, 279 F.3d 348,

354 (6th Cir. 2001)).

The plaintiff has not demonstrated that she meets or equals Listing 12.05.  Initially, it is

questionable whether the plaintiff meets the diagnostic criteria requiring onset of mental retardation

before the age of 22.  The plaintiff attended special education classes and is illiterate; however, the

only IQ score from her childhood was 73, indicating that her intellectual functioning was in the

borderline range.[27]   Nevertheless, it is not necessary to determine whether the plaintiff meets the

diagnostic description because she plainly fails the severity criteria of sections (B) and (C).  Section

(B) requires an IQ score of 59 or less, and, although the plaintiff obtained scores in this range of 55,

54, and 50 during her consultative examination with Mr. Doran, Mr. Doran specifically found that

these scores were invalid.  (Tr. 278-83.)  The plaintiff has not shown that Mr. Doran's decision to

invalidate her scores was in error; consequently, these scores cannot be used to satisfy the listing.

In the absence of other qualifying scores, the plaintiff cannot satisfy Listing 12.05(B).  For the same

reason, she cannot satisfy Listing 12.05(C) because she has no valid IQ scores between 60-70.


### b.  Listing 3.03(B)

The plaintiff also argues that she is entitled to a finding of disability under Listing 3.03(B),

which provides as follows:

3.03 Asthma.  With:

. . . .

B. Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring
physician intervention, occurring at least once every 2 months or at least six times a
year.  Each in-patient hospitalization for longer than 24 hours for control of asthma
counts as two attacks, and an evaluation period of at least 12 consecutive months
must be used to determine the frequency of attacks.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.03(B).

Asthma attacks are defined in section 3.00(C) as:

prolonged symptomatic episodes lasting one or more days and requiring intensive
treatment,  such  as  intravenous  bronchodilator  or  antibiotic  administration  or

---

[27] A person with an IQ score between 71-84 will generally be diagnosed with borderline
intellectual functioning.  *See* DSM-IV-TR at 740.

prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting. Hospital admissions are defined as inpatient hospitalizations for longer than 24 hours. The medical evidence must also include information documenting adherence to a prescribed regimen of treatment as well as a description of physical signs. For asthma, the medical evidence should include spirometric results obtained between attacks that document the presence of baseline airflow obstruction.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00(C).

In her memorandum, the plaintiff refers to specific treatment dates as evidence that she experienced the requisite number of asthma attacks to satisfy Listing 3.03(B). Docket Entry No. 9-1, at 19-20. She cites two treatment dates in 2004, one in 2005, three in 2006, three in 2007, seven in 2008, two in 2009, and one in 2010.[28] *Id.* Thus, it is immediately clear that the plaintiff did not meet the required number of six attacks in 2004, 2005, 2006, 2007, 2009, or 2010. In 2008, the plaintiff cites seven treatment dates: April 28, May 27, June 14, June 27, August 25, September 26, and December 28, 2008. *Id.* However, four of these dates, those occurring on April 28, May 27, June 27, and September 26, were for follow-up examinations and/or medication refills. (Tr. 436, 439, 441-42.) On these occasions, the plaintiff did not present with an asthma attack and did not receive breathing treatments. *Id.* Consequently, these doctor visits do not meet the level of severity described in section 3.00(C) and, therefore, do not qualify as asthma attacks under Listing 3.03(B).

---

[28] The plaintiff cites the following treatment dates: June 14, 2004; September 14, 2004; August 31, 2005; February 4, 2006; June 11, 2006; October 28, 2006; February 23, 2007; August 11, 2007; August 27, 2007; April 28, 2008; May 27, 2008; June 14, 2008; June 27, 2008; August 25, 2008; September 26, 2008; December 28, 2008; January 20, 2009, December 6, 2009, and June 21, 2010. Docket Entry No. 9-1, at 19. Additionally, the Court's review of the record indicates that the plaintiff may have sought treatment for asthma attacks on January 3, 2005; January 24, 2006; July 6, 2010; and August 4, 2010. (Tr. 260-66, 340, 485-86, 489-90.) Even including these latter dates, however, the plaintiff did not have the requisite number of attacks in any given year to satisfy Listing 3.03(B).

The exclusion of these dates brings the maximum possible number of attacks in 2008 down to three. Thus, the plaintiff has failed to show that she meets Listing 3.03(B) in any year.[29]

The plaintiff also argues that the ALJ should have obtained a medical expert witness to address whether the plaintiff medically equaled Listing 3.03(B). Docket Entry No. 9-1, at 20. The plaintiff has not cited any authority for this proposition or otherwise explained her argument. Social Security Ruling 96-6p, provides that, while the ALJ is "responsible for deciding the ultimate legal question whether a listing is met or equaled," "longstanding policy requires that the judgment of a physician . . . designated by the Commissioner on the issue of equivalence . . . must be received into the record as expert opinion evidence and given appropriate weight." Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3. The Ruling also provides that Disability Determination and Transmittal forms are an appropriate way for a State authorized physician to offer an expert opinion on the issue of equivalency. *Id.* Here, the record contains Disability Determination and Transmittal forms completed by DDS physicians at both the initial and reconsideration levels of administrative review. (Tr. 83-86.) Both forms address the plaintiff's complaints of asthma and both conclude that asthma was not a disabling impairment. *Id.* The ALJ appropriately considered the opinions of these physicians in reaching his decision, and the plaintiff's argument that the ALJ should have obtained the testimony of a medical expert witness is without merit.

---

[29] The Court seriously questions whether the plaintiff suffered asthma attacks, as that term is defined in section 3.00(C), on some of the dates to which she refers. In any event, the plaintiff clearly fails to satisfy the minimum number of attacks.

**4. The ALJ's RFC determination is supported by substantial evidence in the record.**

The plaintiff makes separate arguments that her physical RFC should be less than sedentary and that the ALJ's RFC finding is not supported by the record. Docket Entry No. 9-1, at 2, 20-22. Because both arguments focus on the weight that the ALJ gave certain evidence when determining the plaintiff's RFC, the Court will address both arguments together.

First, the plaintiff argues that her RFC should provide for less than sedentary work based on Dr. Mehta's opinion that she could lift and/or carry no more than ten pounds occasionally. Docket Entry No. 9-1, at 20. The Regulations define sedentary work as involving "lifting no more than 10 pounds at a time." 20 C.F.R. § 416.967(a). Initially, the Court notes that Dr. Mehta's opinion is internally inconsistent. Dr. Mehta opined that the plaintiff can lift and/or carry less than ten pounds occasionally (defined as "up to 1/3 of an 8 hour workday") while simultaneously opining that she can lift and/or carry ten pounds frequently (defined as "from 1/3 to 2/3 of an 8 hour workday"). (Tr. 387.) If the plaintiff can lift ten pounds frequently then she can do so occasionally. Although the ALJ did not directly address the inconsistency in Dr. Mehta's opinion, the ALJ reasonably found Dr. Mehta's opinion to be that the plaintiff "can lift and carry 10 pounds" and gave his opinion significant weight. (Tr. 14, 16.) Moreover, even if Dr. Mehta had opined that the plaintiff could only lift less than ten pounds, the ALJ did not give controlling weight or otherwise purport to adopt Dr. Mehta's opinion in its entirety. It would have been entirely appropriate for the ALJ to give significant weight to Dr. Mehta's opinion as a whole but not incorporate his lifting limitation in the plaintiff's RFC. Ultimately, it was the ALJ's responsibility, not Dr. Mehta's, to determine the

plaintiff's RFC based on the record as a whole, and, with respect to the plaintiff's ability to lift and carry, the ALJ's RFC finding is supported by substantial evidence.

Next, the plaintiff argues that the ALJ failed to explain why he did not include Dr. Davis' non-exertional limitations in the RFC. Docket Entry No. 9-1, at 21-22. Specifically, the plaintiff argues that the ALJ should have explained his decision not to include a gripping limitation[30] in her RFC.[31] *Id.* However, because Dr. Davis was a consultative examiner, and not a treating source, the ALJ was only required to consider his opinion in light of the factors in 20 C.F.R. § 416.927(c) and was not required to explain his rationale for implicitly rejecting portions of Dr. Davis' opinion. *See Dykes ex rel. Brymer v. Barnhart*, 112 Fed. Appx. 463, 467-68 (6th Cir. 2004) (an ALJ's failure to articulate reasons for rejecting a consultative examiner's opinion is not reversible error). The ALJ thoroughly discussed Dr. Davis' findings and included limitations in the plaintiff's RFC that were consistent with, or more limiting than, Dr. Davis' opinion. The ALJ's RFC finding is supported by substantial evidence in the record.

---

[30] The plaintiff also contends that the ALJ misunderstood Dr. Davis' opinion that she was limited with regard to "repetitive/forceful grip." Docket Entry No. 9-1, at 21-22; (tr. 286). The ALJ interpreted this limitation to be that the plaintiff could not perform "repetitive and forceful" gripping (tr. 16), but the plaintiff argues that Dr. Davis found she was unable to perform repetitive gripping and also unable to perform forceful gripping. Docket Entry No. 9-1, at 21. The plaintiff made this argument at the hearing (tr. 62), and the ALJ impliedly rejected the plaintiff's interpretation. To the extent that Dr. Davis' opinion is susceptible to different interpretations, the Court does not find error with the ALJ's interpretation. In any event, the issue of interpretation is moot because the ALJ did not include any gripping limitation in the plaintiff's RFC.

[31] The plaintiff appears to argue that the ALJ implicitly rejected all of Dr. Davis' nonexertional limitations, including those for "heat/humidity, irritating inhalants, [and] climbing/heights." Docket Entry No. 9-1, at 21; (tr. 286). However, the ALJ accounted for some of these limitations in the plaintiff's RFC, finding that she "cannot be exposed to temperature extremes or pulmonary irritants . . . [and] can occasionally perform postural activities." (Tr. 14.)

## IV. RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 9) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. See *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge